## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

**MUTTAQIN FATIR ABDULLAH,**       :

    **Plaintiff**       :

                **CIVIL ACTION NO. 3:15-924**

    **v.**       :

                **(JUDGE MANNION)**

**Officer HESS,**       :

    **Defendant**       :

## MEMORANDUM

## I.   Background

Plaintiff, Muttaqin Fatir Abdullah, an inmate confined in the United States Penitentiary, Lewisburg, ("USP-Lewisburg"), Pennsylvania, filed the above captioned Bivens[1] action pursuant to 28 U.S.C. §1331. (See Doc. 1, complaint). He names Corrections Officer Matthew Hess as the sole Defendant. Id. Plaintiff alleges that on March 14, 2013, he was "being escorted by Officer Hess from Z-Block to D-Block to the 3rd floor to be placed with an unknown inmate in cell 322." Id. When they arrived at the cell the unknown inmate "would not except (sic) inmate Abdullah into cell 322 and made threats that he was going to bring inmate Abdullah some harm if [he] came into the cell." Id. Inmate Abdullah asked Officer Hess "why is he

---

[1]Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 397 (1971).

demanding [Plaintiff] to go into a cell with an inmate that's not willing to except [him] and making threats to do [him] harm if [he] comes into his cell." Id. He claims that "Officer Hess spin Inmate Abdullah around and threw him down to the floor", at which time "several officers arrived to the scene to use accessive (sic) force by pressing Inmate Abdullah's face into the concrete floor and one of the officers hit Inmate Abdullah in the top of his head as he was lying face down on the floor." Id. at 3. Plaintiff states that "their (sic) was so much force on [his] back, [he] could barely breath." Id. Plaintiff was then "taken down stairs to the first floor to be placed in 24 hr. restraints." Id.

On May 12, 2015, Plaintiff filed the instant action in which he claims that "Officer Hess provoke this incident because of his over zealous reaction, inconsideration and unprofessional conduct by staff." Id. For relief, Plaintiff seeks compensatory damages in the amount of six million dollars. Id.

Presently before the Court is Defendant's motion to dismiss and for summary judgment. (Doc. 12). The motion has been fully briefed and is ripe for disposition. For the reasons that follow, Defendant's motion for summary judgment will be granted.

## II.   Standards of Review

### A. Bivens Standard

Plaintiff's claims are filed pursuant to 28 U.S.C. §1331, in accordance with Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics, 403 U.S. 388, (1971). Under Bivens, the District Court has federal question jurisdiction pursuant to 28 U.S.C. §1331 to entertain an action brought to redress alleged federal constitutional or statutory violations by a federal actor. Bivens, supra. Pursuant to Bivens, "a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal question jurisdiction of the district court to obtain an award of monetary damages against the responsible federal official." Butz v. Economou, 438 U.S. 478, 504 (1978). A Bivens-style civil rights claim is the federal equivalent of an action brought pursuant to 42 U.S.C. §1983 and the same legal principles have been held to apply. See, Paton v. LaPrade, 524 F.2d 862, 871 (3d Cir. 1975); Veteto v. Miller, 829 F.Supp. 1486, 1492 (M.D.Pa. 1992); Young v. Keohane, 809 F.Supp. 1185, 1200 n. 16 (M.D.Pa. 1992). In order to state an actionable Bivens claim, a plaintiff must allege that a person has deprived him of a federal right, and that the person who caused the deprivation acted under color of federal law. See West v. Atkins, 487 U.S. 42, 48 (1988); Young v. Keohane, 809 F.Supp. 1185, 1199 (M.D.Pa. 1992);

Sharpe v. Costello, 2007 WL 1098964, *3 (M.D.Pa., 2007).

### B. **Motion to Dismiss**

Defendant's pending dispositive motion is supported by evidentiary materials outside the pleadings. Federal Rule of Civil Procedure 12(d) provides in part as follows:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleading are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given reasonable opportunity to present all the material that is pertinent to the motion.

Fed.R.Civ.P. 12(b)(d).

This Court will not exclude the evidentiary materials accompanying the Defendant's motion. Thus, the motion will be treated as solely seeking summary judgment. See Latham v. United States, 306 Fed. Appx. 716, 718 (3d Cir. 2009) (when a motion to dismiss has been framed alternatively as a motion for summary judgment such as in the present case, the alternative filing "is sufficient to place the parties on notice that summary judgment might be entered.")

### C. **Summary Judgment**

Pursuant to Federal Rule of Civil Procedure 56(a) "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law."
Fed.R.Civ.P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322
(1986). "[T]his standard provides that the mere existence of some alleged
factual dispute between the parties will not defeat an otherwise properly
supported motion for summary judgment; the requirement is that there be no
genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
247-48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence
would affect the outcome of the case under applicable substantive law.
Anderson, 477 U.S. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070,
1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is
such that a reasonable jury could return a verdict for the nonmoving party.
Anderson, 477 U.S. at 257; Brenner v. Local 514, United Brotherhood of
Carpenters and Joiners of America, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the
court must view the facts and all reasonable inferences in favor of the
nonmoving party. Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v.
Consolidated Rail Corporation, 963 F.2d 599, 600 (3d Cir. 1992); White v.
Westinghouse Electric Company, 862 F.2d 56, 59 (3d Cir. 1988). In order to

avoid summary judgment, however, parties may not rely on unsubstantiated allegations. Parties seeking to establish that a fact is or is not genuinely disputed must support such an assertion by "citing to particular parts of materials in the record," by showing that an adverse party's factual assertion lacks support from cited materials, or demonstrating that a factual assertion is unsupportable by admissible evidence. Fed.R.Civ.P. 56(c)(1); see Celotex, 477 U.S. at 324 (requiring evidentiary support for factual assertions made in response to summary judgment). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986). Parties must produce evidence to show the existence of every element essential to its case that they bear the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U .S. at 323; see Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir.1992). Failure to properly support or contest an assertion of fact may result in the fact being considered undisputed for the purpose of the motion, although a court may also give parties an opportunity to properly provide support or opposition. Fed.R.Civ.P. 56(e).

### III.   **Statement of Facts**[2]

On March 14, 2013, Officer Hess wrote Incident Report No. 2420798, charging Abdullah with the prohibited act of Assaulting a Staff Member, a violation of Code 224. (Doc. 17-1 at 11, Incident Report).

He described the incident as follows:

> On the above date and time I was attempting to place inmate Abdullah #12465-171 into cell D-322. The inmate then started to twist his body in an aggressive manner. The inmate then pushed his body in a backward motion and struck me with his shoulder in my upper chest area. I then placed the inmate on the ground to regain control.

Id.

---

[2]Middle District of Pennsylvania Local Rules of Court provide that in addition to filing a brief in response to the moving party's brief in support, "[t]he papers opposing a motion for summary judgment shall included a separate, short and concise statement of material facts responding to the numbered paragraphs set forth in the statement [of material facts filed by the moving party] ..., as to which it is contended that there exists a genuine issue to be tried." See M.D. Pa. LR 56. 1. The rule further states that the statement of material facts required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party. See id. Because Plaintiff has failed to file a separate statement of material facts controverting the statement filed by Defendant Hess, all material facts set forth in Defendant's statement (Doc. 12) will be deemed admitted.

This event was captured on video by a prison surveillance camera.[3]

(Doc. 16, Ex. 1, video (SEALED).)

The video corroborates Officer Hess' description of the incident, in that it shows the following:

> The two inmates are standing in the hallway outside of a cell with escorting officers, both inmates wearing hand restraints. Other staff remove items from the cell and then carry what appears to be the inmate's belongings into the cell. Then Officer Hess walks Abdullah toward the cell door. Just before he enters the cell, Abdullah turns around and makes a quick movement toward Officer Hess, hitting Officer Hess in the chest with his shoulder. Officer Hess immediately takes Abdullah to the floor. The other inmate is quickly secured inside the cell as other officers who are present restrain Abdullah on the floor. Additional officers arrive to assist. Once Abdullah has been brought under control, he is escorted out of the area.

Id.

On April 16, 2013, the Discipline Hearing Officer ("DHO") conducted a hearing regarding the charge of assault against Abdullah. (Doc. 17-1 at 14, Discipline Hearing Officer Report). At the hearing Abdullah offered the following statement:

---

[3]Although this exhibit is sealed for the safety and security of the institution, Plaintiff was afforded the opportunity to view the video on September 11, 2015. (See Doc. 23 at 6). As such, Plaintiff's motion for reconsideration of this Court's September 8, 2015 Order sealing Defendant's exhibit will be denied.

> Inmate Abdullah testified that Section 11 of the incident report is not accurate. Inmate Abdullah testified he refused to enter cell D-322, "because the other inmate (Richardson, #26975-037) stated 'don't come into the cell'." The DHO informed Abdullah that the video footage of the incident depicted Richardson standing on the D-3 range with Abdullah, and therefore Richardson was not inside the cell. Abdullah then stated "he (Richardson) threatened me." The DHO asked Abdullah how Richardson threatened him. Abdullah stated "I told you, he stated 'don't come into the cell'." Abdullah further testified he never assaulted the reporting officer during the incident, and never struck the reporting officer in the chest with his shoulder. Inmate Abdullah made no complaints of procedural error during the hearing.

Id.

The documentary evidence which the DHO considered in making his determination included:  (1) Memoranda dated March 14, 2013, from Ritz, Fisher, Mitterling and Kemmerer; (2) Staff Injury Assessment and Follow Up Form, dated March 14, 2013, prepared with regard to Officer Hess; and (3) Video footage of the incident, recorded by video camera surveillance system. Id.  The specific evidence taken from the relied upon documentary evidence was as follows:

> The DHO finds inmate Abdullah committed the prohibited act of Assault. This finding is based upon the eyewitness written account of the reporting officer, which indicates on 3-14-2013 at 12:29 p.m., the reporting officer was attempting to place inmate Abdullah, #12465-171, into cell D-322 when inmate Abdullah started twist his body in an aggressive manner. Inmate Abdullah then pushed his body in a backward motion and struck the reporting officer with his shoulder in the upper chest. The

9

reporting officer then placed inmate Abdullah on the ground to regain control.

This finding is further based on the memorandum of Ritz, dated 3-14-2013. Officer Ritz reports on 3-14-2013, at approximately 12:29 PM, he assisted escorting inmate Abdullah, #12465-171, to D-Block, where he was going to be placed into cell 322 with inmate Richardson, #26975-037. Officer Ritz witnessed Abdullah turn and strike the escorting officer in the chest area, at which time Abdullah was placed on the ground.

This finding is further based on the memorandum of Fisher, dated 3-14-2013. Officer Fisher reports on 3-14-2013, at approximately 12:29 PM, he was assisting in placing inmate Muttaqin Abdullah, #12465-171 into cell D-322 with inmate Corey Richardson, #26975-037. Officer Fisher witnessed inmate Abdullah strike the escorting officer in the upper torso with his shoulder, at which time inmate Abdullah was placed on the ground.

This finding is further based on the memorandum of Mitterling, dated 3-14-2013. Officer Mitterling reports on 3-14-2013, at 12:29 PM, he was on the D-Block third-floor range when Officer Hess attempted to place inmate Muttaqin Abdullah, #12465-171, into cell 322. Officer Mitterling reports inmate Abdullah assaulted Officer Hess by striking him in the chest with his shoulder, and attempting to pull away. Officer Hess then placed inmate Abdullah on the floor.

This finding is further based on the memorandum of Kemmerer, dated 3-14-2013. Officer Kemmerer reports on 3-14-2013 at 12:29 PM, he called for assistance on the B-Block third-floor range. Officer Kemmerer observed inmate Abdullah, #12465-171, being escorted to cell 322, Upon arriving at the door area, Abdullah stopped, pushed his body back towards escorting staff, then turned and rammed his shoulder into the escorting officer's chest area. Consequently, Abdullah was placed on the floor.

This finding is further based upon the DHO's review of the video

10

footage of the incident, recorded by the video camera surveillance system. This DHO's review of this video footage is documented as follows:

> 12:27:24 PM   The reporting officer is observed escorting Abdullah, #12465-171, to the door of cell D-322. Abdullah is observed speaking at staff, and shaking his head in a side to side manner, commonly understood as nonverbal communication for "No".

> 12:28:05 AM[4]  Abdullah is observed standing on the D-3 range, and appears to be refusing to enter cell D-322. Abdullah is observed speaking at the staff were present, and continues to shake his head in a side to side manner, commonly understood as nonverbal communication for "No". Other staff that are present are observed speaking with inmate Abdullah, in an apparent attempt to convince him to enter cell D-322. Abdullah remains standing still on the D-3 range, and does not move.

> 12:28:18 AM  Officer Kemmerer is observed arriving at the scene of the incident, and is observed pointing his right arm and hand toward the door to cell D-322. Officer Kemmerer is clearly instructing Abdullah to enter cell D-322.

> 12:28:25 PM  The reporting officer begins to escort inmate Abdullah into cell D-322. Inmate Abdullah is observed bracing his legs, thereby exerting force with his legs toward his rear, directed at the reporting officer, in an effort to resist the reporting officer's escort.

---

[4]The Court believes this to be a typographical error contained in the DHO report as the record establishes that the incident occurred at approximately 12:29 PM, not AM.

12:28:28 PM As Abdullah nears the doorway to cell D-322, he abruptly stops walking, and suddenly turns his upper body toward the reporting officer, striking the reporting officer in the upper chest with this right shoulder. The reporting officer placed inmate Abdullah on the floor of the D-3 range.

Inmate Abdullah denied committing any prohibited act in this case. He presented in his defense verbal testimony, in which he alleged that Section 11 of the incident report is not accurate.

Inmate Abdullah testified he refused to enter cell D-322, "because the other inmate (Richardson #26975-037) stated 'don't come into the cell'." The DHO informed Abdullah that the video footage of the incident depicted Richardson standing on the D-3 range with Abdullah, and therefore Richardson was not inside the cell. Abdullah then stated "he (Richardson) threatened me". The DHO asked Abdullah how Richardson threatened him. Abdullah stated "I told you, he stated 'don't come into the cell'." Abdullah further testified he never assaulted the reporting officer during the incident, and never struck the reporting officer in the chest with his shoulder.

The DHO gives the greater weight of the evidence in this case to the eyewitness written account of the reporting officer, the memoranda of Ritz, Fisher, Mitterling and Kemmerer, dated 3-14-2013; and the video footage of the incident, recorded by the video camera surveillance system. This evidence substantiates on 3-14-2013, at approximately 12:29 PM, the reporting officer escorted inmate Abdullah to cell D-322. Abdullah is observed on the video footage of the incident bracing his legs, thereby exerting force with his legs toward his rear, directed at the reporting officer, in an effort to resist the reporting officer's escort. As Abdullah nears the doorway to cell D-322, he abruptly stops walking, and suddenly turns his upper body toward the reporting officer, striking the reporting officer in the upper chest with his right shoulder.

The DHO has considered as evidence in this case the testimony

12

of inmate Abdullah, in which he denied committing any prohibited act in this case and alleged that Section 11 of the incident report is not accurate. Abdullah further testified he never assaulted the reporting officer during the incident, and never struck the reporting officer in the chest with his shoulder. The DHO considers this evidence to be less credible than that to which the greater weight is given in this case, for the following reasons. First, video footage of the incident clearly depicts Abdullah bracing his legs, thereby exerting force with his legs toward his rear, directed at the reporting officer, in an effort to resist the reporting officer's escort. As Abdullah nears the doorway to cell D-322, he abruptly stops walking, and suddenly turns his upper body toward the reporting officer, striking the reporting officer in the upper chest with his right shoulder. This video footage is irrefutable and clearly corroborates the eyewitnesses written account of the reporting officer, as well as the memoranda of Ritz, Fisher, Mitterling, and Kemmerer, dated 3-14-2013.

The DHO notes that Abdullah presented testimony during the hearing, in which he attempted to mitigate or justify his actions by alleging he refused to enter cell D-322, because the other inmate (Richardson, #26975-037) "threatened him" by stating "don't come into the cell". The DHO has considered this testimony as evidence, however, notes there was no credible evidence presented during the hearing to support Abdullah's allegations, causing the DHO to question the integrity of these allegations. Although Abdullah can certainly make such allegations in his defense, without some sort credible evidence to support them, the DHO gives these allegations very little weight. Moreover, the DHO notes that the first time Abdullah raised these allegations was during his testimony presented during the hearing in this case, although he had several opportunities to make similar allegations at earlier stages of the discipline process. Finally, the DHO notes that documentary evidence from five separate staff eyewitnesses was considered as evidence in this case. None of this documentary evidence references any threats, or statements which could be construed as threats, made by inmate Richardson toward inmate Abdullah. The DHO has concluded, therefore, that

13

> Abdullah's testimony regarding his alleged rationale for engaging in the act is not evidence supporting a finding that he did not commit a prohibited act in this case, nor does it constitute sufficient justification for committing the prohibited act, nor does it mitigate the severity of the prohibited act committed in this case.
>
> The greater weight of the evidence in this case, therefore, supports the finding inmate Abdullah committed the prohibited act of Assault, Code 224.

Id. The DHO sanctioned Petitioner to disallowance of twenty-seven (27) days good conduct time; ninety (90) days disciplinary segregation; 150 days loss of visiting and commissary privileges; and $100.00 monetary fine (freeze commissary pending satisfaction of the monetary fine). Id. The DHO documented his reasons for the sanctions given as follows:

> Assaulting others in a correctional institution inherently jeopardizes the security and good order of the institution. The rationale for the sanctions imposed in this case, therefore, is to punish the inmate for his misconduct, which is viewed as having an adverse effect on the security and orderly operation of the institution, as well as to deter further misconduct. Disciplinary segregation is imposed as punishment for the misconduct. Disallowed Good Conduct Time is imposed to demonstrate that engaging in misconduct will prolong inmate Abdullah's period of incarceration. Loss of commissary and visiting privileges are imposed to demonstrate that engaging in misconduct will result in the loss of pleasurable privileges while incarcerated. Finally, a monetary fine is imposed as a sanction, based on the nature of the incident, which involved Abdullah's assault of a Federal Bureau of Prisons staff member.

Id.

14

Pursuant to BOP Program Statement 5566.06, Use of Force and Application of Restraints, "[s]ince inmates occasionally become violent or display signs of imminent violence, it is sometimes necessary for staff to use force and restraints to prevent them from hurting themselves, staff, or others, and/or from destroying property." (Doc. 17-1 at 26, BOP Program Statement 5566.06, Use of Force and Application of Restraints). Staff is authorized to immediately use force and/or apply restraints when an inmate's behavior "constitutes an immediate, serious threat to the inmate, staff, others, property, or to institution security and good order." Id. "In an immediate use of force situation, staff may respond with or without the presence or direction of a supervisor." Id. "After any use of force … the inmate shall be examined by qualified health personnel, and any injuries noted, immediately treated." Id. This policy statement further provides that following any incident involving a use of force, an after action review shall be conducted to determine if policy was adhered to. Id.

An After Action Review of the March 14, 2013 immediate use of force was conducted, and it was determined that "[t]he actions taken with respect to the use of force and/or restraints were reasonable and appropriate and have been reviewed with staff involved". (Doc. 17-1 at 48, Form 586 After

15

Action Review Report).

Immediately following the incident, both inmate Abdullah and Officer Hess were medically assessed. (Doc 17-1 at 54, Staff Injury Assessment and Followup; (Doc. 5, at 4, Clinical Encounter). Officer Hess' medical examination revealed no bruising to Officer Hess' chest and it was noted that he would follow-up with his family doctor if any issues arise. (Doc. 17-1 at 54, Staff Injury Assessment and Followup).

At 12:29 p.m., EMT George Gregory completed a Bureau of Prisons Health Services Clinical Encounter on Plaintiff, which reflects the following:

> Restraint check preformed, no complaints offered 0/10 pain. Strong pulses bilateral. Cap refill less the 2 seconds. Normal movement of fingers and toes.
>
> Injury assessment, small abrasion to the left hand, secondary survey unremarkable for any other injuries. 0/10 pain patient offers no complaints of pain.

(Doc. 5 at 4, Bureau of Prisons Health Services Clinical Encounter).

The remainder of the restraint checks conducted while Plaintiff was in twenty-four hour restraints, demonstrate that at no time did Plaintiff complain of any pain or injuries from either the alleged excessive force used by Defendant Hess, or from the restraints. (Doc. 5 at 1-16, Bureau of Prisons Health Services Clinical Encounters).

## IV.    Discussion

### A.    Eighth Amendment Excessive Force Claims

As the United States Court of Appeals for the Third Circuit has observed:

> The Eighth Amendment protects against infliction of "cruel and unusual punishment." However, "not every governmental action affecting the interests or well-being of a prisoner is subject to Eighth Amendment scrutiny." Whitley v. Albers, 475 U.S. 312, 319 (1986). "After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Id. (citation and internal quotations omitted). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock." Id.

> Resolution of an Eighth Amendment claim therefore "mandate[s] an inquiry into a prison official's state of mind." Wilson v. Seiter, 501 U.S. 294, 299 (1991). Two considerations define that inquiry. We must first determine if the deprivation was sufficiently serious to fall within the Eighth Amendment's zone of protections. Id. at 298. If not, our inquiry is at an end. However, if the deprivation is sufficiently serious, we must determine if the officials acted with a sufficiently culpable state of mind. Id. In other words, we must determine if they were motivated by a desire to inflict unnecessary and wanton pain. "What is necessary to establish an 'unnecessary and wanton infliction of pain ...' varies according to the nature of the alleged constitutional violation." Hudson v. McMillian, 503 U.S. 1, 5 (1992).

17

Fuentes v. Wagner, 206 F.3d 335, 344-45 (3d Cir. 2000).

An Eighth Amendment excessive force claim entails a showing of some subjective intent to injure. In an excessive force case, where "prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is that set out in Whitley [v. Albers, 475 U.S. 312 (1986)]: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992).

Thus, the keystone to analysis of an Eighth Amendment excessive force claim often entails issues of motivation–whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. Hudson v. McMillian, 503 U.S. 1, 6-7 (1992). However, the issue of whether excessive force was used is one which, in proper circumstances, can be determined as a matter of law. In such cases, summary judgment is appropriate when "it appears that the evidence, viewed in the light most favorable to the plaintiff, will [not] support a reliable inference of wantonness in the infliction of pain." Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (quoting Whitley, 475 U.S. at 322). There are several factors that a court examines in determining whether a correctional officer has used

excessive force in violation of the Eighth Amendment, including: "(1) 'the need for the application of force'; (2) 'the relationship between the need and the amount of force that was used'; (3) 'the extent of injury inflicted'; (4) 'the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them'; and (5) 'any efforts made to temper the severity of a forceful response.'" Id. at 106.

When considering such claims, the reasonableness of a particular use of force is often dependent upon factual context and must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.", 490 U.S. 386, 396-7 (1989). Moreover, in the context of prison excessive force claims, in determining "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," Hudson v. McMillian, 503 U.S. 1, 6-7 (1992), "even if we concede [that an inmate] has established at most that prison officials over-reacted to the disturbance that he caused. . . , any such over-reaction would still fall short of supporting a finding that prison officials acted 'maliciously and sadistically to cause harm.'" Fuentes v. Wagner, 206 F.3d 335, 346 (3d Cir. 2000).

Further, in the specific factual context of excessive force claims based

upon allegations relating to a prisoner's handcuffing, courts have acknowledged that, in certain instances, government officials are entitled to qualified immunity as a matter of law. Gilles v. Davis, 427 F.3d. 197, 207 (3d Cir. 2005). With respect to these particular excessive force claims, the test for qualified immunity can be simply stated: "In these cases, summary judgment for an officer who claims qualified immunity is appropriate where, 'after resolving all factual disputes in favor of the plaintiff,[ ] the officer's use of force was objectively reasonable under the circumstances.' " Id.

The sole allegation of excessive force raised by Plaintiff in the above captioned action is that on March 14, 2013, Officer Hess spun him around and pushed him to the floor. However, as is evinced by the undisputed facts of record in the instant action, Officer Hess initiated an immediate use of force in response to Abdullah suddenly twisting his body around and pushing his body backward toward Officer Hess. Thus, with respect to Officer Hess' quick decision to subdue Abdullah in response to Abdullah displaying acts of imminent violence, and recognizing that summary judgment is appropriate only when the evidence, "viewed in the light most favorable to the plaintiff, will [not] support a reliable inference of wantonness in the infliction of pain." Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (quoting Whitley, 475 U.S.

at 322), the Court finds that the initial decision to apply force did not violate the Eighth Amendment. Secondly, as to the relationship between the need for force and the amount of force used, the record reveals that Officer Hess did nothing more than place Abdullah on the floor. There is no record of injury, other an a small laceration to Plaintiff's left hand. With regard to the fourth factor, the Court finds it reasonable for Officer Hess to perceive that allowing Abdullah to twist away from his physical control posed a threat to his own safety and the safety of other inmates and staff in the immediate area, and possibly to the safety of the institution if he had been able to completely free himself from the control of prison staff. Finally, as to whether an effort was made to temper his response,  Abdullah's actions posed an immediate threat requiring an immediate response, and there was no time to attempt to negotiate or reason with Abdullah. However, it is clear from the record that Officer Hess used only minimal force to regain control of Abdullah.

Thus, circumstances of the situation amply justified the use of force; the force applied was modest, given the dangers inherent in Abdullah's threatening conduct; the risk to staff and others posed by Abdullah's conduct was great; and the quick response needed to respond to Abdullah's threatening stance, demonstrated that it would have been extremely

dangerous to further temper these security measures. Therefore, when considering the reasonableness of this authorized use of force, which must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," Graham v. Connor, 490 U.S. 386, 396-97 (1989), the Court finds that the actions of the prison officials " would still fall short of supporting a finding that prison officials acted 'maliciously and sadistically to cause harm.' " Fuentes v. Wagner, 206 F.3d 335, 346 (3d Cir. 2000).

### B.    Qualified Immunity

Even if Abdullah had stated a colorable constitutional claim relating to Officer Hess' use of force, the Defendants would still be entitled to qualified immunity from these claims for damages. In order to establish a civil rights claim Abdullah must show the deprivation of a right secured by the United States Constitution or the laws of the United States. Satisfying these elements alone, however, does not guarantee that Abdullah is entitled to recover damages from these public officials. Government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[ ] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609(1999); see

also Pearson v. Callahan, 555 U.S. 223 (2009). This doctrine, known as qualified immunity, provides officials performing discretionary functions not only defense to liability, but also "immunity from suit." Crouse v. S. Lebanon Twp., 668 F.Supp.2d 664, 671 (M.D.Pa.2009) (Conner, J.) (citations omitted).

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact'." Pearson, 555 U.S. at 231.

Determinations regarding qualified immunity, and its application in a given case, require a court to undertake two distinct inquiries. First, the court must evaluate whether the defendant violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201–02 (2001), abrogated in part by Pearson, 555 U.S. 223; Curley v. Klem, 499 F.3d 199, 206 (3d Cir.2007); Williams v. Bitner, 455 F.3d 186, 190 (3d Cir.2006). If the defendant did not actually commit a constitutional violation, then the court must find in the defendant's favor. Saucier, 533 U.S. at 201. If the defendant is found to have committed a

constitutional violation, the court must undertake a second, related inquiry to assess whether the constitutional right in question was "clearly established" at the time the defendant acted. Pearson, 555 U.S. at 232; Saucier, 533 U.S. at 201–02. The Supreme Court has instructed that a right is clearly established for purposes of qualified immunity if a reasonable state actor under the circumstances would understand that his conduct violates that right. Williams, 455 F.3d at 191 (citing Saucier, 533 U.S. at 202).

In order to find that a right is clearly established, "the right allegedly violated must be defined at the appropriate level of specificity." Wilson, 526 U.S. at 615. The Supreme Court has explained that, at least in some cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." Hope v. Pelzer, 536 U.S. 730, 741 (2002) (quoting United States v. Lanier, 520 U.S. 259, 271 (1997) (internal quotation marks and citation omitted)). In some cases, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Wilson, 455 F.3d at 191 (quoting Hope, 536 U.S. at 741).

The court is no longer required to conduct these two inquiries

sequentially, Pearson, 555 U.S. at 239–40, and it may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. Id. Where a court elects to address the alleged constitutional violations, however, the court's analysis of the merits for purposes of summary judgment merges with analysis of the deprivation of federal rights for purposes of qualified immunity. Gruenke v. Seip, 225 F.3d 290, 299–300 (3d Cir.2000); Crouse, 668 F.Supp.2d at 671; see also Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir.1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record ... to establish ... a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).") Because qualified immunity entails a consideration of whether the law was clearly established at the time of a defendant's conduct, this defense, which focuses on the state of the law, presents a question of law for the court, and one which can often be resolved on summary judgment. See Montanez v. Thompson, 603 F.3d 243 (3d Cir.2010).

In the specific factual context of excessive force claims based upon allegations relating to a prisoner's handcuffing, courts have acknowledged

that, in certain instances, summary judgment is entirely appropriate. Gilles v. Davis, 427 F.3d 197, 207 (3d Cir.2005). With respect to these particular excessive force claims, courts agree that: "In these cases, summary judgment for an officer who claims qualified immunity is appropriate where, 'after resolving all factual disputes in favor of the plaintiff,[ ] the officer's use of force was objectively reasonable under the circumstances.' " Id.

Applying these benchmarks, the Court finds that the Defendants are entitled to qualified immunity in this case. The record does not evince anything that would have alerted the Defendants that their actions violated "clearly established statutory or constitutional right[ ] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999). Moreover, the duration of Abdullah's detention in restraints fell squarely within the 24 hour time frame which had previously and repeatedly been recognized as a discrete period of time which did not give rise to constitutional concerns. See, e.g., Key v. McKinney, 176 F.3d 1083, 1086 (8th Cir.1999) (no Eighth Amendment violation where prisoner handcuffed and shackled for 24 hours); Hunter v. Bledsoe, No. 10–CV–927, 2010 WL 3154963 (M.D.Pa. Aug.9, 2010) (ambulatory restraints used for 24 hours); Holley v. Johnson, No. 08–CCV–629, 2010 WL 2640328 (W.D.Va. June 30, 2010) (ambulatory

restraints used for 48 hours); Zimmerman v. Schaeffer, 654 F.Supp.2d 226, 232 (M.D.Pa.2009) (19 hours or more in restraint chair). Accordingly, Defendants are entitled to qualified immunity from damages in this case.

C. **Claims Based on Disciplinary Proceedings**

The sanctions levied against Abdullah during his disciplinary hearing, were all imposed as a result of prison misconduct. As such, the Court finds that any Fourteenth Amendment claim regarding his disciplinary hearing is barred under Heck v. Humphrey, 512 U.S. 477 (1994) and Edwards v. Balisok, 520 U.S. 641 (1997).[5] Under some circumstances, a prisoner may bring a Bivens claim for monetary damages based on the denial of due process during a prison disciplinary hearing. See Wolff v. McDonnell, 418 U.S. 539, 554 (1974) (stating that plaintiff's §1983 "damages claim was ... properly before the District Court and required determination of the validity of the procedures employed for imposing sanctions, including loss of good time, for flagrant or serious misconduct"). However, such due process claims cannot be brought in a Bivens action where the claims "necessarily imply the

---

[5]While Heck, and Balisok all involved §1983 cases, courts have extended their holdings to Bivens actions. See Lora-Pena v. F.B.I., 529 F.3d 503, 506 n. 2 (3d Cir.2008) ("Although Heck involved a §1983 action by a state prisoner, the reasoning in Heck has been applied to bar Bivens claims" (citing Williams v. Hill, 74 F.3d 1339, 1341 (D.C. Cir.1996) (per curiam)).

invalidity of the punishment imposed" unless the plaintiff shows that the sanctions have been overturned. See Balisok[6], 520 U.S. at 648 (finding claims for declaratory and monetary relief based on allegations that plaintiff was denied opportunity to present a defense and that hearing officer was biased could not be brought pursuant to §1983); Heck, 512 U .S. at 486-87 ("We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a §1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. §2254.").

---

[6]In Edwards v. Balisok, the Supreme Court applied the lessons of Heck to a state prisoner action, seeking compensatory and punitive damages, challenging the constitutionality of procedures used in a prison disciplinary proceeding that resulted in the loss of good-time credits, but not necessarily challenging the result and not seeking the restoration of the good-time credits. Again, the Court emphasized that such a claim is not cognizable under §1983 if a favorable outcome would necessarily imply the invalidity of the challenged judgment, there the disciplinary finding and punishment. 520 U.S. at 646-8.

## V.    Conclusion

Based upon the undisputed facts of record, Defendant Hess is entitled to summary judgment with respect to Plaintiff's claim of excessive force. Additionally, Defendant's request for qualified immunity will be granted with respect to Plaintiff's claim of excessive use of force. An appropriate order shall issue.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATED: March 15, 2016**
O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2015 MEMORANDA\15-0924-01.wpd